1      UNITED STATES BANKRUPTCY COURT
               DISTRICT OF DELAWARE

2

3    IN RE:                    .  Chapter 11
                               .  Case No. 20-10940 (LSS)
4    ALPHA ENTERTAINMENT LLC,  .
                               .
5        Debtor.               .
                               .
6    . . . . . . . . . . . . . .
                               .
7    PETER HURWITZ, solely in  .  Adversary Proceeding
     his capacity as Plan      .  No. 22-50256 (LSS)
8    Administrator of Alpha    .
     Entertainment LLC,        .
9                              .
         Plaintiff,            .
10                             .
     v.                        .
11                             .
     OLIVER LUCK,              .
12                             .
         Defendant.            .
13                             .
     . . . . . . . . . . . . . .
14                             .
     OLIVER LUCK,              .
15                             .
         Third-Party Plaintiff, .
16                             .
     v.                        .
17                             .  Courtroom No. 2
     VINCENT K. MCMAHON,       .  824 Market Street
18                             .  Wilmington, Delaware 19801
         Third-Party Defendant. .
19                             .  Monday, January 23, 2023
     . . . . . . . . . . . . . .  1:59 p.m.
20

21             TRANSCRIPT OF HEARING
        BEFORE THE HONORABLE LAURIE SELBER SILVERSTEIN
22           CHIEF UNITED STATES BANKRUPTCY JUDGE

23

24

25

APPEARANCES:

For Plan Administrator
Peter Hurwitz:                Anthony W. Clark, Esquire
                             GREENBERG TRAURIG, LLP
                             222 Delaware Avenue
                             Suite 1600
                             Wilmington, Delaware 19801

                             Howard J. Steinberg, Esquire
                             1840 Century Park East
                             Suite 1900
                             Los Angeles, California 90067


For Defendant/Third-
Party Plaintiff Oliver
Luck:                        Gregory Joseph Flasser, Esquire
                             BAYARD, P.A.
                             600 North King Street
                             Suite 400
                             Wilmington, Delaware 19801

                             -and-

                             Eric S. Goldstein, Esquire
                             SHIPMAN & GOODWIN, LLP
                             One Constitution Plaza
                             Hartford, Connecticut 06103




Audio Operator:              Brandon J. McCarthy, ECRO

Transcription Company:       Reliable
                             The Nemours Building
                             1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
                             Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com

Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

1                              INDEX

2   MOTIONS:                                            PAGE

3   Agenda
    Item 1:   Motion for Transfer of Venue                 4
4             [Adv. Docket No. 13, Filed May 17, 2022]

5             Court's Ruling:                             66

6

7   Transcriptionist's Certificate                        68

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Proceedings commenced at 1:59 p.m.)

2                  THE CLERK:  Please rise.

3                  THE COURT:  Please be seated.

4                  MR. CLARK:  Good afternoon, Your Honor.

5                  THE COURT:  Good afternoon.

6                  MR. CLARK:  Tony Clark with Greenberg Traurig for

7    the Plaintiff, Peter Hurwitz, plan administrator for Alpha

8    Entertainment.  I'd like to introduce my colleague Howard

9    Stern -- Steinberg, who has been admitted *pro hac vice*, and

10   with the Court's permission, will be handling the argument

11   today.

12                  THE COURT:  Yes.

13                  MR. CLARK:  Thank you, Your Honor.

14                  THE COURT:  Thank you.

15                  MR. FLASSER:  Good afternoon, Your Honor.  Greg

16   Flasser from Bayard, on behalf of Oliver Luck.  Introducing

17   my co-counsel here, Eric Goldstein, who has also been

18   admitted *pro hac vice*.  I'll turn the podium over to him.

19                  THE COURT:  Mr. Goldstein --

20                  MR. GOLDSTEIN:  Good afternoon, Your Honor.

21                  THE COURT:  -- good afternoon.

22                  MR. GOLDSTEIN:  For the record, Eric Goldstein, on

23   behalf of Oliver Luck.

24                  Your Honor, I will confess that it's not often the

25   case you move to transfer venue and an avoidance action.  And

1  I will confess that an estate representative is entitled to

2  due deference to their choice of venue in bringing an

3  avoidance action in the same district where the main case is.

4  But there are rare instances, there are rare cases where a

5  transfer venue --

6            THE COURT:  Excuse me.

7            MR. GOLDSTEIN:  Bless you, Your Honor.

8            -- but there are the rare cases where, in the

9  interest of justice and the convenience of the parties and

10 witnesses, it makes sense, and this is one of them.

11           There's a number of factors here that I'm just

12 going to highlight very briefly at the opening, that

13 differentiate this case from the garden-variety avoidance

14 action that we're so used to deal with.  One, there's the

15 existence of multi-year litigation in the Connecticut

16 District Court involving these same parties:  Mr. Luck,

17 Alpha, Mr. McMahon.

18           There's a pending motion to withdraw the reference

19 in this case and at some point, the reference will be

20 withdrawn, because the parties have sought a jury trial and

21 not consented to do so before the Bankruptcy Court.

22           THE COURT:  Okay.  I take it that the district

23 court judge has not ruled on that?

24           MR. GOLDSTEIN:  Correct, Your Honor.  It's fully

25 submitted and it just hasn't been ruled on yet.

1     There are no other avoidance actions in this case.

2  I checked the docket again this morning just to confirm my

3  recollection and my recollection was confirmed.  There are no

4  other avoidance actions.  This isn't the instance of where

5  you have an estate that's liquidating that's got a multitude

6  of avoidance actions and you risk inconsistent judgments or

7  you really emphasize the centrality of the bankruptcy

8  process.  This is one.  This is the only one.

9     Most fact witnesses are going to be third-party

10  witnesses.  Mr. Luck is Mr. Luck.  He's an individual.  He

11  doesn't have anybody he could compel or ask politely to show

12  up and Alpha is a defunct entity.  So, the witnesses here are

13  going to be third parties.  They're going to be former

14  employees of Alpha.  They're going to be former or current

15  employees of World Wrestling Entertainment.  Those folks, we

16  believe, are in Connecticut.

17     The debtor had its principal place of business in

18  Connecticut.  It used -- its two owners, Mr. McMahon and

19  World Wrestling Entertainment are in Connecticut.

20  Mr. McMahon is a citizen.  World Wrestling has its principal

21  place of business there.

22     The nature of the claims at issue here, and I know

23  we're going to talk about this in one quick second, involve

24  events that occurred in Connecticut and put at issue, the

25  services provided by Mr. Luck under an employment contract

1   that was governed by Connecticut law.  And, finally, which is
2   also unusual, there's a third-party claim by Mr. Luck against
3   Mr. McMahon in this case seeking recoveries of any monies
4   that get avoided and recovered by the plan administrator.
5   Mr. Luck brings a claim to have those paid by Mr. McMahon
6   under a guaranty, which is governed by Connecticut law.

7   So, briefly, if I may, just to explain kind of how
8   we got here, because it's a little convoluted, in this
9   adversary proceeding is a complaint by the plan administrator
10  against Mr. Luck, who's the former CEO and Commissioner of
11  the XFL, seeking recovery under two theories:  preference and
12  fraudulent transfer.  And the fraudulent transfer being a
13  constructive fraudulent transfer, both under 548 and 554.

14  Focusing on the fraudulent transfer comes in two
15  theories, also.  One is that the obligation incurred under
16  the employment contract was incurred for less than reasonably
17  equivalent value, based on the services that Mr. Luck was to
18  provide and that Alpha received less than reasonably
19  equivalent value for the payment of the compensation because
20  Mr. Luck's performance was deficient.

21  And, specifically, those alleged deficiencies
22  involve the same allegations that came up with the
23  Connecticut District Court case.  This was involvement in the
24  negotiating of venue contracts; involvement in signing a
25  player, a Mr. Calloway (phonetic); a failure to attend

1  meetings after the onset of COVID; use of XFL electronic

2  devices for personal reasons; and disclosing confidential

3  information.  And those will all sound similar, because I'm

4  going to get to -- familiar -- because I'm going to get to

5  them in a second in the context of the district court action.

6           The district court action.  Just days before Alpha

7  filed for bankruptcy, Mr. Luck was terminated in April 2020

8  from his position.  Shortly thereafter, Mr. Luck commenced

9  the lawsuit against Mr. McMahon in Connecticut District Court

10 to recover unpaid compensation that was due to him under his

11 employment contract.  The District Court in Connecticut ruled

12 that Alpha had -- was an indispensable party and needed to be

13 brought into the case and, thus, Mr. Luck moved for relief

14 from stay in this case to do so for the limited purpose of

15 seeking a declaration as to the nature of his termination,

16 and agreed not to pursue any recovery against Alpha, but

17 solely against Mr. McMahon.

18           So, the stay was lifted.  They were joined.

19 Shortly thereafter, in November 2020, a settlement was

20 reached between Alpha's estate and Mr. McMahon to allow

21 Mr. McMahon to bring claims and causes of action of Alpha,

22 other than Chapter 5 claims, which they're at issue here,

23 against Mr. Luck in the Connecticut District Court action.

24 Two-thirds, if memory serves, of that recovery goes to --

25 would have gone to Alpha and the rest being kept by Mr.

1 McMahon.

2           Consistent with that agreement in early 2021,

3 Alpha brought those counterclaims against Mr. McMahon under a

4 breach of contract and breach of fiduciary duty theories.

5 And the underlying allegations are very similar to the ones I

6 just recited in the plan administrator's complaint; it has to

7 do with the hiring of Mr. Calloway, proper use of a company

8 phone, a violation of confidential -- confidentiality

9 requirements, abandonment duties of COVID.  Those were the

10 needs for the factual allegations under breach of contract

11 and breach of fiduciary duty theories.

12           Flash forward into 2022, the case was heavily

13 litigated.  We attached the docket sheet to our motion just

14 to give it flavor.  February 2022, the Connecticut District

15 Court ruled on cross-motions for summary judgment and a

16 number of other pending motions and ultimately narrowed the

17 case considerably.  The judge was able to dismiss a number of

18 the claims, the breach of contract claims and the breach of

19 fiduciary duty claims with regard to Mr. Luck, and narrowed

20 it to a very -- an issue concerning the hiring and

21 termination of one of the players, Mr. Calloway, and whether

22 or not that was cause for Mr. Luck to be terminated and

23 whether if it was, it could have been cured.

24           So after that decision, a jury trial was set to

25 commence in July of 2022 and as things happened, at the end

1  of June 2022, the litigation was settled.  And it was a

2  confidential settlement agreement and the case was dismissed,

3  which brings us to August of 2022.  That's when Mr. Luck

4  brought that third-party complaint against Mr. McMahon in

5  this case, to the extent any of his compensation is avoided

6  and recovered.  That's how we got here.

7       So, under the 20 U.S.C. 1412 and, you know, the

8  case law directs you to look at the Jumara factors.  And

9  going through those factors, and I'll go through them very

10  briefly right now, I think all of them are either, with the

11  exception of Plaintiff's choice of forum, either are neutral

12  or favor transfer of venue.  So, obviously, one Plaintiff's

13  choice of forum, that's in favor of keeping it here and the

14  case law, you know, admittedly gives that a strong weight.

15       The Defendant's choice of forum, obviously,

16  Mr. Luck wants to litigate this in Connecticut.  That,

17  admittedly, case law says is not given as equal as one,

18  right.  So, those don't necessarily cancel each other out,

19  but that's where we are for the first two.

20       The third is where the claims arose -- if they

21  arose elsewhere.  Here, the claims arose in Connecticut.  The

22  plan administrator argues that the claims arose where the

23  Debtor was located and where the recipient received the

24  payment.  Both were in Connecticut.  The principal place of

25  business is in Stanford, Connecticut, for Alpha.  Mr. Luck

was the CEO and Commissioner of the XFL. He worked out of
Stanford, Connecticut, out of the headquarters, with the
exception of when he traveled for business.

The -- there was the use by Alpha of the services
of WWE. So, if you -- backing up for a second, Mr. McMahon
is the principal owner of Alpha. His company, which he
previously founded, World Wrestling Entertainment, was also
an owner of Alpha and also provided services under a shared-
services agreement. And so, WWE is also headquartered in
Stanford.

The employment contract at issue in this, as I
mentioned before, it's governed by Connecticut law in the
performance of that, or I guess, the allegation meaning the
lack of performance of it would have been in Connecticut.
So, with regard to case law in this, the plan administrator
argues, and they cite RCS Creditor Trust and Stone & Webster
that, look, the performance of -- where the performance was
in these types of avoidance actions doesn't matter.

Looking at those cases, RCS cites to Stone &
Webster -- Stone & Webster, and in another case called Hayes
Lemmerz -- I don't know if I'm pronouncing that right -- but
those cases, Stone & Webster, Hayes Lemmerz, those are
preference cases and it totally makes sense, right; that
where you perform under a contract doesn't make -- have much
bearing on the 547 analysis.

1       But here, what's at issue, this is, like, a

2   routine preference case, with regard to the fraudulent

3   transfer claims.  What is here put at issue is Mr. Luck's

4   performance under the employment agreement.  The allegation

5   in paragraph 15 of the complaint is that the compensation was

6   vastly greater than the value of Mr. Luck's services.  The

7   allegation in the next paragraph, 16, is that Luck's

8   performance, as Commissioner and CEO, was woefully

9   inadequate.

10       So, it's hard to disentangle the performance of

11  the employment agreement from the allegations in the

12  complaint and thus, we'd argue that the -- that where the

13  claim arose was in Connecticut.

14       Location of books and records is our next one.

15  This one, you know, seems a vestige of older times.  This

16  is -- you know, we live in the world of electronic discovery,

17  so in my view, this is neutral, but if it had to be tilted in

18  any potential direction, I think it would tilt a little bit

19  towards Connecticut, again, just because that's where Alpha

20  had its place of business and it was reliant on shared

21  services with WWE, which is still in Connecticut.

22       Convenience of the parties and the witnesses, I

23  was going to kind of take those together.  With regard to the

24  parties, obviously, Mr. Luck would prefer -- this is more

25  convenient for Mr. Luck in Connecticut.  He's got my firm,

1  Shipman & Goodwin. We're in Connecticut. We've been

2  involved in more of a local counsel role in the district

3  court case. And then I have been personally involved in the

4  bankruptcy case, starting from the point where we had to get

5  the lift stay.

6         And, you know, obviously, as much as I enjoy

7  working with Attorney Flasser and the Bayard Firm, Mr. Luck,

8  my client, would prefer to not have to pay two sets of

9  lawyers, so if this could at all be litigated in Connecticut,

10 that's beneficial to him.

11        The plan administrator, I gather from reading the

12 plan administrator agreement, which was annexed to the plan

13 supplement, lives in Irvington, New York, which is about 25

14 to 30 miles from the state of Connecticut, which is a lot

15 closer than it is to Delaware. And the third-party Defendant

16 Mr. McMahon is a -- he's a Connecticut citizen.

17        With regard to the witnesses, as I mentioned at

18 the outset, these are going to be third-party fact witnesses

19 in this case, bearing on things like the negotiation of the

20 employment contract, the search, the back-and-forth from that

21 negotiation, the services rendered by Mr. Luck. So, this is

22 going to be the executives, or I guess the former executives

23 of Alpha, and this is going to be the folks at WWE, the

24 executives who were involved in the early days of Alpha.

25        So, based on those statement of financial affairs,

1  it appears the primary officers of Alpha, Mr. Pollock and

2  Mr. DeVito, had business addresses in Connecticut, so we

3  presume that they would still be in Connecticut.  And if this

4  litigation was in Connecticut, they could be compelled by

5  subpoena to appear at trial.  Mr. McMahon, he's a party, but

6  is a citizen of Connecticut.

7          We believe that WWE senior executives and staff

8  may also have important testimony on the case and they would

9  be in and around Connecticut because of where WWE is

10 headquartered in Stanford.  All these people who would likely

11 be out of subpoena range of this Court and given the way that

12 Mr. Luck was terminated at the end of his employment, I

13 don't -- I can't -- my guess would be that nobody's going to

14 cooperate with him to appear, absent a subpoena.  So, for all

15 those reasons, you know, having this case in Connecticut

16 would be easier from that perspective, as well.

17         The plan administrator argues that there's no

18 additional expense for Mr. Luck.  Again, we've addressed

19 that; there are, unfortunately, additional expenses with

20 regard to local counsel, which could be avoided if we were in

21 Connecticut.  And I think that this wouldn't create -- and I

22 understand that this is very important in this context -- an

23 additional expense for the estate or for the plan

24 administrator.

25         The plan administrator's lead counsel is

1   Mr. Steinberg.  He comes out of the Greenberg Traurig office

2   in LA.  He's got local counsel from Greenberg Traurig who

3   handles this in Delaware.

4         If this was in Connecticut, he'd replicate the

5   same thing; in fact, the plan administrator appeared very

6   briefly in the Connecticut District Court action through a

7   *pro hac* motion.  It's referenced in Exhibit F to our motion

8   if you look at the end of the docket sheet, which was filed

9   by a colleague at Greenberg Traurig, who's admitted to

10  practice in the District Court of Connecticut.  So, it would

11  just be a matter of swapping one of the local Delaware

12  attorneys for somebody at the firm who's admitted in

13  Connecticut.

14        And, of course, I'd make a pitch for my fellow

15  members of the Bar in Connecticut.  There's a lot of good

16  bankruptcy lawyers up there who are cheaper.  They're very

17  good, but they're cheaper than Delaware lawyers, but they're

18  very good and, you know, there could be a cost-savings there,

19  as well.  So, you know, at a minimum, we're talking neutral,

20  potentially a cost-savings for the estate, which I understand

21  is important.

22        Enforceability of the judgment.  I see that as a

23  neutral factor, right, whether it's this District or the

24  District of Connecticut, I don't think anybody's going to

25  question the enforceability of those judgments, which brings

1   us to practical considerations that would make trial easy,

2   expeditious or inexpensive.

3           And this is where, although while we filed the

4   motion to transfer venue while the district court action was

5   still pending, not knowing that it was going to resolve, it

6   doesn't change the fact that there were two years of

7   experience that was gained by the District Court in

8   Connecticut overseeing same parties, dealing with, not the

9   exact issue, but very similar issues, given many of the same

10  facts, with regard to, you know, Alpha's counterclaims with

11  regard to Mr. Luck's performance of his duties as CEO and

12  Commissioner, as well as going the other way, Mr. Luck's

13  claims under the guaranty, with regard to Mr. McMahon.  In

14  that instance, it was for his compensation promise to the

15  future.  In this instance, it would be a compensation promise

16  to him that's now been avoided.

17          So, taking advantage of that institutional

18  knowledge can do nothing but create efficiencies here and

19  that stands in contrast to where we are in this adversary

20  proceeding, where we're at the beginning.  We're at the very

21  beginning and Your Honor has not yet had the opportunity, or

22  the District Court, to really engage on those issues.

23          So, the plan administrator argues that, look, it's

24  more efficient to litigate it here because there may be

25  another preference case and we should centralize that, which

1  I get, but as I said at the outset, there is no other

2  avoidance action. There was a potential claim that's

3  referenced in the papers and Attorney Steinberg will set me

4  right if I got it wrong, but I think that may have been

5  resolved, but, at least, all I can say for certain is as of

6  today, there's nothing else on the docket.

7         The plan administrator also argued in their papers

8  that, you know, the pending motion to withdraw the reference

9  doesn't alter the analysis in any way because bankruptcy

10 courts can, and sometimes do, adjudicate cases up to trial

11 and then it passes to the district court. Well, first, the

12 plan administrator argued in the papers to the district court

13 that they wanted immediate withdrawal of the reference, which

14 is our position, as well, from a judicial economy

15 perspective.

16        But one way or the other, the case is going to

17 wind up in the district court and, seemingly, the question to

18 me was, well, where is that more efficient in a court that

19 has spent a couple of years with these issues or somebody's

20 who's going to start anew? And I think the answer is

21 Connecticut, where there's experience with these issues.

22        The next factor, relative administrative

23 difficulty in the two fora, resulting from congestion of the

24 Court's docket. We'll stipulate that Delaware is a

25 preeminent bankruptcy court where it gets a lot of action,

1  and depending on how the economy goes, gets a ton of action.

2         But I think what guides this one is, again, the,

3  where can efficiencies be gained?  And, again, for all the

4  reasons I'm not going to repeat, but for all those reasons

5  that there have been two years' experience in Connecticut,

6  there are efficiencies to be gained there that could do

7  nothing but help with the relative congestion of both court's

8  dockets.

9         The next factor is the public policy of the fora.

10 So, look, here, the connection to this case in Delaware is

11 that it's a Delaware LLC that can file bankruptcy in

12 Delaware.  Everything else happens in Connecticut here.  Mr.

13 Luck was hired as CEO and Commissioner of Alpha, which had

14 its headquarters in Connecticut.  WWE, which seemed to be

15 quite involved in Alpha, is headquartered in Connecticut.

16 Mr. McMahon, one of the principals, who's also a party at

17 this point, is a citizen of Connecticut.  The employment

18 contract is governed by Connecticut law.  The guaranty that's

19 sought to be enforced against Mr. McMahon is governed by

20 Connecticut law.  You know, everything that happens is kind

21 of in Connecticut, so, you know, I think that there's a

22 stronger argument that, you know, having a Connecticut court

23 preside over that would be more consistent with their public

24 policy of the two fora.

25         The plan administrator argues that there's a

1 strong interest in adjudicating all avoidance indications in

2 one centralized case, which is, again, I mean, if this was a

3 typical bankruptcy case where there'd be 30, 40 preference

4 actions that are going on, where you'd want -- you wouldn't

5 want inconsistent judgments on insolvency and a bunch of

6 similar issues, it would make sense to consolidate it all

7 before one judge. But we don't have that here.

8 Familiarity with the judge with applicable state

9 law. This one, I put as a tilt towards favor of transfer

10 because, while the plan administrator says, Look, there's no

11 state law issues here, there technically is. There's a

12 Count 1, which is under 544, which makes reference to the

13 Delaware Uniform Fraudulent Transfer Act. I think there's a

14 pretty good argument that it would be Connecticut's Uniform

15 Fraudulent Transfer Act that should apply under a choice law

16 analysis. I could say it tilts because it's a Uniform

17 Fraudulent Transfer Act -- they're not a ton different -- so,

18 to me, it tilts towards Connecticut.

19 But also that the other factor out there is that

20 there is this third-party complaint against Mr. McMahon that

21 has to do with the contractual issue under a guaranty. That

22 is governed by Connecticut law.

23 Finally, local interests in deciding local

24 controversies at home. This is really going to bleed over

25 the same thing as the public, you know, policy of the fora.

1  Again, because the -- so much happened in Connecticut, here,

2  in this case, the hiring, the performance, the payment, the

3  places of business where the witnesses are, where the third-

4  party Defendant is, all of that, to me, is in Connecticut, so

5  more of a local interest in Connecticut than here.

6          So, for those reasons, it seems -- and, again, I

7  will concede that, like, this is an unusual circumstance.

8  This is not what you, you know, (indiscernible) typically in

9  an avoidance action, but this is that case.  This is that

10 case where those Jumara factors, it makes sense to transfer

11 the case to Connecticut.

12         So, you know, unless Your Honor has questions,

13 then we'd ask that the motion to transfer be granted.

14         THE COURT:  The only question I have is what's the

15 process, if this were transferred to the district court in

16 Connecticut, would it be assigned to the judge who had the

17 other matter?

18         MR. GOLDSTEIN:  I asked this question of my --

19 some of my colleagues who've clerked in the district court

20 (indiscernible).

21         THE COURT:  Uh-huh.

22         MR. GOLDSTEIN:  What I was told the process is, is

23 this, if the case gets transferred, it would initially go to

24 the clerk.  The process is that you would reach out, on copy

25 to all parties, to Judge Bolton's chambers.  You would go to

1 his courtroom deputy and law clerks and ask that this case is

2 coming, here's a copy of the complaint, we'd ask that Judge

3 Bolton consider contacting the chief judge of the district to

4 ask that it just be assigned to him.

5 Full candor, Judge Bolton could say no. He's got

6 that discretion, is my understanding in talking to the

7 clerks, but if he was at all, you know, if he was at all

8 interested, and I hope he would be given his involvement in

9 the case, then he would just -- his chambers would reach out

10 to the chief judge and then a chief judge can make the

11 assignment. That's the mechanics.

12 THE COURT: And how many judges are there in the

13 district court in that Connecticut -- is he in a division?

14 Are they are divisions in district?

15 MR. GOLDSTEIN: It's like --

16 THE COURT: There's three, aren't there?

17 MR. GOLDSTEIN: Yeah, there's Hartford, New Haven,

18 and Bridgeport. I am not, as I stand here today, I am not --

19 I could look it up when I sit down -- but I don't know off

20 the top of my head how many there are. I want to say eight,

21 but I could be wrong.

22 THE COURT: It just seems that Judge Bolton gets

23 all the cases that I have that have any connection with

24 Connecticut; that's why I asked.

25 MR. GOLDSTEIN: He's a lucky guy.

1          (Laughter)

2               MR. GOLDSTEIN:  But I'm not sure, to answer your

3  question.

4               THE COURT:  Thank you.

5               MR. GOLDSTEIN:  Thank you.

6               THE COURT:  Mr. Steinberg?

7               MR. STEINBERG:  Thank you.  Good afternoon, Your

8  Honor.

9               THE COURT:  Good afternoon.

10              MR. STEINBERG:  Mr. Goldberg [sic] says it's a

11 rare case where you transfer venue of an adversary proceeding

12 where there are avoidance actions claims; in fact, they fail

13 to cite a single case in the Third Circuit or any case in the

14 entire country, where a Bankruptcy Court has transferred

15 venue of an adversary proceeding that asserts avoidance

16 action claims.  It's no accident that they didn't cite any of

17 those kinds of cases.  There -- Mr. Luck is represented by

18 very capable counsel.

19              And so, the word "rare," in my view, is an

20 overstatement.  I'm not aware of any Bankruptcy Court that

21 has transferred venue of an avoidance action claim.  But

22 let's put that to the side for a second.

23              THE COURT:  Right.  Let's put that to the side for

24 the moment.

25              MR. STEINBERG:  Right.

1          THE COURT:  Because the cases I read, and I did

2     read the cases that were cited in this jurisdiction, they are

3     either preference cases, which I think are a wholly different

4     animal than a fraudulent conveyance case, or they're very

5     distinguishable.

6          MR. STEINBERG:  Well, several of the cases we did

7     cite from Delaware also include -- granted, there are

8     preference claims, but there are also fraudulent transfer

9     claims in at least two to four of the cases that we cited.

10    And so, I don't think that that should be overlooked.

11         And in my view, there's two principal reasons --

12         THE COURT:  Okay.

13         MR. STEINBERG:  -- why motions to transfer venue

14    of adversary proceedings which assert avoidance action claims

15    are not transferred.  First is significant weight is given to

16    the Plaintiff's choice of forum and, second, numerous

17    considerations under the Jumara test are furthered by having

18    the Bankruptcy Court where the case is pending, decide the

19    issues.

20         Luck doesn't dispute the holding of the <u>Barry</u> case

21    that we cited, which said that due to policy considerations,

22    there's a strong impetus to maintaining an adversary

23    proceeding in the home court.

24         So, I'm going to do three things in my argument,

25    Your Honor.  First, I'm going to address the facts and legal

1 issues that are raised in this adversary proceeding.  Second,

2 I'm going to examine the facts and legal issues that were

3 raised in the Connecticut litigation that was settled.  And,

4 finally, I'll discuss the Jumara factors.

5 So, first, let me turn to what's alleged in this

6 adversary proceeding.  And as Mr. Goldberg correctly pointed

7 out, there are two preference claims:  one for the 90-day,

8 one for the one-year, and two fraudulent transfer claims.

9 What he doesn't say, and what he said, which in my

10 view is erroneous, is he says that there are two different

11 theories for the fraudulent transfer claims.  He said one is

12 lack of reasonably equivalent value and one is failure to

13 perform.  But that's just not so.

14 Both fraudulent transfer claims are based on lack

15 of reasonably equivalent value.  It's our view that

16 regardless of performance on the part of Mr. Luck, if he was

17 the greatest Commissioner ever to walk the earth, the amount

18 of money he received, in no way, shape or form, constitutes

19 reasonably equivalent value.  He was making more money than

20 commissioners of major professional sports with billions of

21 dollars in revenue, such as the National Hockey League.  And

22 so, there's no way to look at it.

23 What we mention, though, is that even though,

24 regardless of how he performed, there's no way that this is

25 reasonably equivalent value.  We --

1          THE COURT:  You said that in your brief, but the

2   complaint has a specific allegation with respect to his

3   performance, and that it was woefully inadequate.

4          So, what was the point of those allegations if

5   they're not being used?

6          MR. STEINBERG:  I didn't say they're not being

7   used.  In my view, it's more like chicken soup where you say,

8   It couldn't hurt.  You know, our view would be to say that it

9   doesn't matter how he performed --

10          THE COURT:  Okay.

11          MR. STEINBERG:  -- but, in this instance, there

12   are several instances where you can point to facts where he

13   just didn't do a good job.

14          Now, Mr. Goldberg says, Well, doesn't that change

15   the whole way that you should look at the case?  But let's

16   look at the facts, they're not complicated.  The facts that

17   we're talking about are not complicated and they're not even

18   in dispute.

19          Mr. Goldberg makes reference to the fact that

20   there was Mr. Calloway, who was a wide-receiver, who had a

21   checkered background, who was hired, which was -- because of

22   his checkered background, that was contrary to policy.

23          THE COURT:  Against policy.

24          MR. STEINBERG:  Right.

25          And so, that's not something that's in dispute.

1 There's no question that Mr. Calloway was hired and there's

2 no question what the policy says.

3         THE COURT: But whether that's -- whether

4 that's -- whether that is performance that would constitute

5 something you could base a finding of reasonably -- not

6 reasonably equivalent value, I don't know. Just saying that

7 that's not disputed isn't sort of the end of the story, and I

8 don't know if it's disputed or not. I suspect it's somewhat

9 disputed.

10         But I don't think the fact that you say that there

11 are undisputed facts means that you're not relying on it or

12 that, and when I hear you are, even though it's a backup, I'm

13 not sure I agree with you on that.

14         MR. STEINBERG: All right. Then, let me assume

15 that what you're saying is -- not just assume -- if you're

16 not agreeing with me, let me turn to that, to the import of

17 that.

18         THE COURT: Yes.

19         MR. STEINBERG: And so, assume, then, that there

20 are a few facts that are up in the air that they'll dispute

21 as to whether or not he did a good job or didn't do a good

22 job.

23         THE COURT: Uh-huh.

24         MR. STEINBERG: There weren't determinations made

25 about those facts in the Connecticut litigation. The

1  Connecticut litigation, in that litigation, and I guess I'll
2  turn to the second portion of what I was going to say in
3  terms of what is alleged there, Mr. Luck argued and sued
4  because he said he was wrongfully terminated and he was
5  entitled to a few years going forward for compensation.

6          What we're talking about is seeking to recover the
7  compensation he already received, all right.  Now, the issue
8  in that case was, Was there cause to terminate Mr. Luck in
9  that Connecticut litigation?  And there was a ruling by that
10 Connecticut judge where the judge said, You know what?  You
11 didn't give the guy notice and a chance to cure and so,
12 because you didn't give him notice and a chance to cure, I'm
13 going to find that you don't have an argument that he
14 breached the contract.

15         But we're not arguing breach of contract here.
16 Breach of contract has no bearing on this litigation.  And we
17 cited a couple of cases for you, the Grandparents.com case
18 and the ECF case, which say you're talking about two
19 different animals when you're talking about fraudulent
20 transfer claims and breach of contract.  One has nothing to
21 do with the other.  They mention nothing about that in their
22 reply and they don't try to refute that proposition.  They
23 say nothing.

24         And so, it doesn't matter from a fraudulent
25 transfer perspective, whether the contract was breached or it

1  wasn't breached, in order for us to prevail.  And so the fact

2  that we raise a few of these issues that the Connecticut

3  judge did not determine and was not asked to determine, he's

4  just aware that they were raised, doesn't elevate this to the

5  status of where this case should be transferred to the judge

6  merely because in this other litigation involving breach of

7  contract claims, some of the same facts were referred to.

8          Now, if you look at the four claims that we're

9  alleging with respect to the preference claims, there's not

10 even a hint that any of the elements of a preference claim --

11         THE COURT:  I would agree with you, but I'm not

12 focused on the preference claims.

13         MR. STEINBERG:  All right.  And so, then, let's

14 talk about the fraudulent transfer claims and in terms of the

15 factual issues, okay.  In the Connecticut litigation, there

16 was nothing -- nothing touching upon whether the compensation

17 Mr. Luck received was reasonable.  It was not an issue.  They

18 say nothing about it in their papers and that is the central

19 issue in this litigation, was the amount that he was paid,

20 was that reasonably equivalent value?  It was not an issue in

21 that litigation, period.  End of story.

22         With respect to the other elements that we need to

23 prove in connection with the fraudulent transfer claims,

24 issues pertaining to solvency:  Where the debtors solvent?

25 Nothing in that litigation pertained to solvency, nothing at

1  all.

2          And so, really, what's happening here is what

3  they're doing is they're waving a flag in front of you and

4  saying, Hey, they made some references to some facts here.

5  Those same facts were referenced in the other litigation.

6  And what they said in their papers, which is, I think a

7  little different than what Mr. Goldberg said in his argument

8  and in the papers, they said same issues of law and fact were

9  addressed in there.  Now, he said similar.

10         But they weren't the same issues and, in my view,

11  they weren't, from a legal perspective, in terms of the

12  issues to be resolved, they were not similar whatsoever.

13  They were not the same.  They were not similar.  They were

14  totally different.

15         This is not a breach of contract case.  We are not

16  proving a breach of contract case in order to get a remedy

17  here with respect to what we're seeking here on the avoidance

18  claims.  And so, to me, this is a "forest through the trees"

19  argument on their part; again, they certainly got your

20  attention by making reference to some of those facts, but ask

21  yourself, are those facts, you know, do those facts have to

22  be adjudicated in order for us to get the relief that we're

23  seeking in the four claims that we've asserted?  And the

24  answer is no.

25         And so, with that being said, you know, let me

1  turn to the Jumara factors, if I may.  There are 12 of them

2  and of those 12, I believe 10 or 11 of them weigh, either in

3  favor of the Court retaining the case, or are neutral.  And

4  so, I have a very different take on them, obviously, than

5  Mr. Goldberg did, so let me briefly walk through them.

6          THE COURT:  Uh-huh.

7          MR. STEINBERG:  The first factor is the

8  Plaintiff's choice of forum, which obviously, that's in our

9  favor.  But that is, according to the case law, it says that

10 that weighs heavily in favor of you retaining this case.  So,

11 it's not equal.  You don't just put them on a scale and say,

12 Four over here, four over there, four neutral.  This one is

13 entitled to more weight.

14          The second factor, which certainly I can see,

15 which is their choice of forum, which is Connecticut.  But

16 the case law that we cite, which they don't refute, says that

17 this is not given the same weight as the Plaintiff's choice

18 of forum.

19          The third factor is where the claim arose.  And

20 courts have said when avoidance actions issues are raised,

21 the essential transaction involves the transfers and the

22 courts look to where the recipient received the payments.

23 And Mr. Luck was an Indiana resident and the payments were

24 sent to him.  And so --

25          THE COURT:  Well, I thought he worked in

1  Connecticut?

2       MR. STEINBERG:  They said that he worked in

3  Connecticut for a period of time.  It's not -- it's my

4  understanding that the payments were sent to him in Indiana,

5  but, you know, I don't want to -- that's my understanding.

6  He was there for a while.  He didn't stay there.  I don't

7  believe it's accurate to say that he moved there and that was

8  his new residence.

9       I believe he worked out of there, you know, for

10  portions of the week, but that he certainly went home.  And

11  so I don't think that that's where the payments were and

12  there's certainly no evidence that they've presented,

13  admissible evidence, that says that the monies were paid in

14  Connecticut.

15       And so, with respect to that --

16       THE COURT:  I'm looking at Judge Walrath's

17  decision --

18       MR. STEINBERG:  All right.

19       THE COURT:  -- in RCS about whether the claim

20  arose elsewhere and where she cites the general law that says

21  where the underlying contract was performed is not relevant

22  and you look to where the transfers are.  But she cites Hayes

23  Lemmerz and, in fact, she, in her own case, says, The

24  performance of the agreement is not at issue.

25       But I think the performance of the agreement is at

1    issue here, that the Plaintiff has put it at issue.  It may

2    be a backup theory, but I think the Plaintiff has put it at

3    issue and I think that makes it different than a normal,

4    certainly, preference action and it may make it different

5    than a normal fraudulent conveyance action.

6              MR. STEINBERG:  Although, what we do say, Your

7    Honor, is that his performance didn't matter because of the

8    amount of compensation was so high.

9              THE COURT:  That's one, but you've got a backup

10   plan and your backup theory, if you just stuck with that

11   theory maybe, but your backup theory is that, And, oh, by the

12   way, his performance was poor, and that's another reason.

13             MR. STEINBERG:  All right.

14             THE COURT:  That's how I read the complaint.

15             MR. STEINBERG:  It's a fair reading of the

16   complaint.

17             THE COURT:  Okay.

18             MR. STEINBERG:  But, again, from -- we make

19   reference to that only for the purpose of saying that it's a

20   tertiary argument to where we're going.  But even if you say,

21   Okay, so his performance -- you want to look at his

22   performance in Connecticut, then, as to those two claims,

23   yes; as to the preference claims, no.

24             Certainly, his performance had nothing to do --

25   the preference claims, money came in.  It didn't matter where

1  he worked.  And so, if you want to say based upon that that

2  half the claims, you know, at least peripherally involve --

3  may involve performance --

4          THE COURT:  I'm not going to split the claims up.

5  I'm not going to keep the preference and send the fraudulent

6  conveyance; they're all going to be tried together.

7          MR. STEINBERG:  Right.  Okay.

8          All right.  So, if you were weighing in that

9  favor, then you could give that one to them, if that's what

10 you think, but the rest of the -- let me go through the rest

11 of Jumara --

12         THE COURT:  Uh-huh.

13         MR. STEINBERG:  -- and let's see how the scales

14 weigh at the end of the day.

15         THE COURT:  Yeah, no.  I've got the 12 factors.

16 One of my colleagues will say, If you have 12 factors, it

17 means nothing.  What do you do with 12 factors?  But go

18 ahead.

19      (Laughter)

20         MR. STEINBERG:  All right.  Location of books and

21 records.  The case authority that we cited said absent

22 evidence by the Movant that there are significant documents

23 at issue, the courts have said this factor favors denial of

24 the motion.  They don't cite any countervailing evidence.

25 They don't cite any -- they have no evidence at all

1  concerning the documents here.  And so, based upon the

2  authority that we cite, this factor should be viewed in our

3  favor.

4          THE COURT:  Maybe.  I mean, there are certainly no

5  documents in Delaware and the documents, if there are going

6  to be, are probably in Connecticut, wouldn't you say?  I

7  mean, that's where the company's headquarters were and even

8  the transfer documents are going to be in Connecticut.

9          MR. STEINBERG:  There'll be some documents there,

10 but the case law says there needs to be significant documents

11 involved before this becomes an issue to weigh in favor of

12 transfer.  And there's no evidence of significant

13 documentation.  We've got an employment contract and we've

14 got -- they've mentioned four issues, you know, of fact as to

15 whether or not he attended some meetings, whether this

16 receiver was of character.  You're not talking about a heavy

17 document case here, so --

18         THE COURT:  That's probably true.

19         MR. STEINBERG:  The next factor is convenience to

20 the parties.  And courts have said absent an evidentiary

21 showing of inconvenience, the factor favors denial.  And they

22 haven't presented evidence of inconvenience here.

23         There's a declaration filed by Mr. Luck that's a

24 few paragraphs long that doesn't really say much of anything

25 in terms of setting forth how he would be inconvenienced.

1  Certainly, he says it's his preference that it be filed

2  there, but there are no facts set forth before you which

3  would explain why it would be so inconvenient, and it's their

4  burden of proof on this issue.

5           And so, given the cases that we've cited, they

6  haven't made a showing of inconvenience.  They've just said

7  he prefers Connecticut and that's insufficient.

8           The next factor is convenience of the witnesses,

9  but only if unavailable for trial.  So, where's the evidence

10 of this?

11          If you look at the Luck declaration, he just said,

12 Well, I interacted with some World Wrestling Entertainment

13 folks; that's all he says.  He doesn't explain in that

14 declaration why they're essential witnesses.  And the only

15 thing I read in the reply brief and I heard from Mr. Goldberg

16 is he said, Well, some of them were involved in negotiation

17 of the contract, but that's not even at issue in this

18 litigation, because there's no dispute the contract was

19 entered into.  There's no dispute as --

20          THE COURT:  Well, why isn't it?  If you're saying

21 that the consideration was excessive, regardless, then why

22 aren't the negotiations important to that?

23          MR. STEINBERG:  Because there's an integration

24 clause in the contract, so evidence relating to the

25 negotiations would be subject to exclusion.  But what we're

1   saying is what was agreed to was the $5 million annual

2   compensation, plus $2 million bonus every year, regardless of

3   whether it should be earned or not.

4           So, there's no dispute that it's $7 million.  What

5   difference does if the negotiations started and Mr. Luck

6   said, I want $10 million and the other side said, Well, I'll

7   give you $5 million and they ended up at $7 million, it

8   doesn't really matter, because --

9           THE COURT:  Well, what if the negotiations

10  included a look at what other people were making?  I don't

11  know what they included, but I don't know that I agree that

12  the negotiations aren't necessarily relevant.  I don't know

13  that I agree with that.  I don't think I can determine that

14  now.

15          MR. STEINBERG:  All right.  Then ask yourself,

16  What evidence do you have in front of you?

17          THE COURT:  I know where the company is located.

18  I know where the -- where he worked out of.  There's no

19  question about that, is there, really?

20          MR. STEINBERG:  But when they say there's WWE

21  employees who are involved, that's what --

22          THE COURT:  Shared services.  They told me there

23  were shared services and I sort of vaguely recall that.

24          MR. STEINBERG:  There were shared services for

25  accounting, okay.  There were -- where WWE provided

1 accounting services for Alpha, that's where the shared

2 services came in.

3          But in terms of negotiating contracts or being

4 involved in the negotiations of this employment contract,

5 frankly, the first I've ever heard of anyone from a WWE being

6 involved was when they raised it in their reply brief.  And

7 we've interacted with Mr. McMahon, who was the party involved

8 in here, and we got documents.  I've never seen anything

9 tying WWE into it, so this is --

10          THE COURT:  Mr. McMahon negotiated the contract?

11          MR. STEINBERG:  Mr. McMahon was involved in the

12 contract.

13          THE COURT:  Well, he's in Connecticut.

14          MR. STEINBERG:  He is in Connecticut, but he's

15 also a party to this litigation.  So, this standard is

16 inconvenience to the witnesses.  Mr. McMahon is a party, and

17 so it's an apples and oranges.  Mr. McMahon will be

18 testifying here.  This is not a case of a witness who will

19 not be around to testify.  And so --

20          THE COURT:  But you would agree that I don't have

21 subpoena power over anybody in Connecticut?

22          MR. STEINBERG:  I do agree with that.  But, again,

23 in terms of what you need here, I would say there's no

24 showing here that you need that subpoena power for any

25 witness who will be important for here, for the disposition

1  of this matter, other than Mr. Luck and Mr. McMahon.

2  There's -- you haven't been given any names and you haven't

3  been told what any of these people will actually testify to.

4        And so, in that vacuum, while you could say it's

5  theoretically possible, that's not the test.  The test is

6  what's the evidence in front of you, with respect to this

7  factor, as opposed to conjecture about who or who may not be

8  needed in connection with this matter.

9        And so, with respect to that, again, I guess what

10  I also want to underscore is, even if you accept their

11  arguments that there could be people in Connecticut, they

12  also have to show that they would be unavailable for trial.

13  It's not just that they may be beyond your subpoena power,

14  but that they will be unavailable and they haven't made that

15  showing.

16        THE COURT:  Well, I tend to think that's the case.

17  These aren't -- this isn't a situation where you have a party

18  who's an ongoing business who can bring their own employees

19  and make them available.  That is not the case here.  We have

20  Mr. Luck, who has no ability to compel anybody to be here.

21  And even Alpha Entertainment has no ability to compel anybody

22  to be here and doesn't exist.

23        I'm more inclined to say that that's, you know,

24  the usual situation where we look at that is when we have two

25  civil litigation and we have two parties and they can compel

1  their own people to be here, but this is not that situation.

2  If there are witnesses and they are in Connecticut, and maybe

3  that's too hypothetical, I may -- I'll think about that --

4  maybe that's too hypothetical -- there's no way that either

5  side actually can compel them to be here.

6      MR. STEINBERG:  I understand your point and I

7  guess I want to focus on what it is that they've

8  demonstrated, in terms of the evidence, and to who they are

9  and who has the burden of proof, and I don't think that

10  they've made their case.

11      With respect to the issue of enforceability of the

12  judgment, the case law that we cited says that absent a

13  showing by the Movant, that a judgment by the home court

14  won't be entitled to full faith and credit, that weighs in

15  favor of denial of the motion.  It's not neutral, as Mr.

16  Goldberg says.  The cases say that it favors denial.

17      So, now, let's turn to the next test, which is

18  practical considerations, that would make the trial easy,

19  expense -- excuse me -- expeditious or inexpensive.  I've

20  heard from Mr. Goldberg that, you know, they -- they're going

21  to incur the expense of local counsel if they have a trial

22  here.  They vanity quantified what that will be and,

23  certainly, they haven't tied that in with any case authority

24  to say that that tips the scales and it should result in the

25  case being tried, other than in the home court.  There's no

1  evidence at all to try to quantify the monetary savings if
2  this case were tried here, as opposed to Connecticut.

3          Secondly, these are bankruptcy issues that are
4  going to be decided.  And what they're talking about is
5  having a Connecticut District Court case -- District Court
6  decide these issues.  I think what's likely to happen if the
7  case remains here, is it will be in front of Your Honor until
8  it's ready for trial.  And then when it's ready for trial, if
9  we go to trial, I think it'll be tried before a district
10 court judge in Delaware.

11         I don't -- from our perspective, in terms of what
12 would make it easier and expeditious, I think we're dealing
13 with judges in Delaware who have a lot more experience
14 dealing with bankruptcy avoidance action claims, than other
15 judges in almost any other part of the country.  And so, in
16 terms of understanding the legal issues and cutting to the
17 chase in terms of what's important with respect to these
18 issues, our view is that we think we're far better off here
19 with the expertise that this Court has and with the expertise
20 that the district courts have in having it resolved here.

21         And by that, I certainly take -- don't mean to
22 sleight Judge Bolton, but I just don't believe that the
23 matters in Connecticut, where you're dealing with avoiding
24 action matters in any way compare with the degree of and
25 magnitude of these issues that the Delaware courts consider

1    on a daily basis on these issues.  And I don't think that

2    that should be overlooked.

3           I'd also want to point out, Your Honor, that this

4    litigation is the last major item in this bankruptcy case,

5    the Alpha bankruptcy case.  It needs to be resolved in order

6    for us to close the case.  And I think that it is more

7    efficient for us to have this Court preside over things and

8    make sure that things get channeled and handled in a way so

9    that we can get this case resolved and we can get this

10   bankruptcy case closed.

11          And if this case is transferred to another

12   district, then the ability to oversee the administration of

13   this case and the handling of this adversary proceeding so

14   that we can close the case is at issue, and I don't think

15   that's something that should be overlooked.

16          Mr. Luck points to the motion to withdraw the

17   reference, but he doesn't quarrel with the fact, again, that

18   this proceeding will likely stay before this Court.  And,

19   again, our point is that we think the Delaware courts have

20   more experience dealing with avoiding action claims.

21          He also argued that the estate litigated claims in

22   the Connecticut litigation, that just isn't so.  Mr. Hurwitz

23   was never a party to that proceeding.  We just assigned

24   claims.

25          THE COURT:  The estate claims were absolutely

1  litigated in the Connecticut litigation.

2          MR. STEINBERG:  But not by Mister -- they were

3  assigned.

4          THE COURT:  I don't care by whom.

5          MR. STEINBERG:  They were assigned.

6          THE COURT:  The debtor was up there.  The debtor

7  was up there -- an estate representative was up there.  I

8  totally disagree with that.

9          MR. STEINBERG:  When you say an estate

10 representative was up there --

11          THE COURT:  The estate representative was up

12 there.  Mr. McMahon was assigned these claims to bring on

13 behalf of the estate and himself and there was a sharing.  I

14 read the stipulation.  I went back because I actually didn't

15 remember it and he -- it was there.  The estate's claims were

16 being litigated up there by Mr. McMahon, but they were, and

17 that was a debtors' choice.

18          MR. STEINBERG:  All right.  I think that the

19 claims were just assigned, but let me take your position --

20          THE COURT:  Well, they were assigned, but the

21 estate was the beneficiary of, what, 66 percent or

22 something --

23          MR. STEINBERG:  Correct.

24          THE COURT:  -- of the recoveries.

25          MR. STEINBERG:  That's correct.

1      THE COURT: Right. So, those estate claims were
2   assigned, but they were the estate claims.
3      MR. STEINBERG: Well, those estate -- if you want
4   to call -- characterize them as estate claims, I understand
5   where you're coming from, but those estate claims were breach
6   of contract claims.
7      THE COURT: Uh-huh.
8      MR. STEINBERG: They were not fraudulent transfer
9   claims.
10     THE COURT: Uh-huh.
11     MR. STEINBERG: They were not preference claims.
12     THE COURT: Uh-huh.
13     MR. STEINBERG: And so, the fact --
14     THE COURT: It's kind of interesting how it
15  happened. I don't know what the impact of that is, but it
16  was kind of interesting.
17     MR. STEINBERG: Well, from the estate's
18  perspective, it had everything to gain and nothing to lose.
19     THE COURT: Sure. It didn't have to foot the cost
20  of the litigation and it gets 66 or 67, whatever it is -- I
21  don't want to be wrong -- of the proceeds. But the estate's
22  claims were litigated up there.
23     MR. STEINBERG: All right. And so -- now, there
24  was no determination with respect to those claims --
25     THE COURT: Mr. McMahon agrees to assert the

1   estate claims on behalf of and in the name of Alpha

2   Entertainment; that's what the stipulation says.  And then

3   the estate gets 67 percent of the collected recovery.

4           MR. STEINBERG:  Right.  Okay.

5           And so, those claims were never litigated to

6   judgment, but even if they were litigated to judgment, the

7   Grandparents.com case and the EBC case say it doesn't matter

8   if there's a breach of contract claim that you can win or

9   lose.  That has nothing to do with your ability to bring

10  avoidance action claims, so --

11          THE COURT:  Well, it may -- yeah, those are two

12  different things, though.  Those are two different -- that

13  doesn't have anything to do with whether, in fact, a judge

14  has some familiarity with the underlying causes of -- the

15  underlying facts that create the causes of action.  They are

16  separate claims.  You could have brought the estate claims

17  here, too -- the -- what you're calling the "estate claims,"

18  the 544 claims --

19          MR. STEINBERG:  Uh-huh.

20          THE COURT:  -- and the preference actions could

21  have all been brought together and it wasn't.  It could have

22  been.

23          MR. STEINBERG:  If we wanted to get embroiled in

24  that litigation, yes.  But, I mean, there's a lot of reasons

25  why they weren't.

1        But I guess the point to underscore, Your Honor,

2   is I don't -- I certainly can't deny that the judge knows

3   some of the facts relating to this underlying litigation --

4        THE COURT:  Uh-huh.

5        MR. STEINBERG:  -- but this underlying

6   litigation -- the facts that he knows are not very

7   complicated facts.  Was there an employment contract?  There

8   was an employment contract.  Was Mr. Luck terminated?  Yes,

9   but that's irrelevant.  Was there cause to terminate him?

10       THE COURT:  I don't know that that's irrelevant.

11       You're saying that his termination is irrelevant

12  to the constructive fraudulent conveyance claim?

13       MR. STEINBERG:  Whether he was -- whether the

14  termination was a breach of the contract or not is irrelevant

15  to the outcome of fraudulent transfer claim.

16       The fact that he was terminated is certainly is a

17  fact that we can point to.  But the issue in that Connecticut

18  litigation was, were there grounds to justify that

19  termination, and that's what was litigated in front of the

20  judge, and we're not litigating that in front of that judge.

21       And so, you know, there could be any number of

22  cases where a debtor could be involved in pre-petition

23  litigation with a party and where it could be pending in

24  another forum that's a non-bankruptcy court.  And so, is it

25  going to be the rule of law that because a debtor engaged in

1  litigation involving pre-petition, non-avoiding action

2  claims, that because of that fact, that if a debtor wants to

3  bring avoiding action claims, that the -- that those avoiding

4  action claims should go to the Court, that --

5            THE COURT:  No, but I don't think those are our

6  facts.  And I also don't think there's any rule of law on

7  that.  I think this whole 12 factors is obviously a weighing

8  and a balancing thing.  There's no rules of law in connection

9  with this.

10           I think you look at each case on its own and you

11  make a determination on it, so I don't think it is.  But I'm

12  looking at your cite and I will say, I didn't pull this case.

13           MR. STEINBERG:  Which one is that, Your Honor?

14           THE COURT:  I didn't pull the EBC I case, which

15  you said stands for the proposition that a transfer may be

16  fraudulent, even if it's made, in accordance with the terms

17  of a contract.  Yeah, that's probably -- that's true.  But I

18  didn't -- so, I didn't read it, because I don't have any

19  problem with that proposition.

20           But to say that they're wholly -- to say that a

21  breach of contract action could not have some underlying

22  facts and be somehow relevant to a fraudulent conveyance

23  action, I think, is very different than saying a transfer may

24  be fraudulent, even if it is made in accordance with the

25  terms of a contract.  Those are two different propositions.

1          MR. STEINBERG:  I understand what you're saying.

2          And in this instance, the breach of contract

3     claims were never adjudicated in the Connecticut litigation.

4          THE COURT:  No, but the Court issued an 80-page

5     summary judgment ruling, making a lot of findings, with

6     respect to the pre-petition conduct.

7          MR. STEINBERG:  As I read that decision, much of

8     it is devoted to whether there was cause for termination and

9     the issue of whether notice was given and an opportunity for

10    cure.  And so, the Court didn't make it -- I didn't read a

11    determination in that 80-page ruling that said, You know

12    what?  Mr. Luck did a really good job, and, you know, these

13    issues, with respect to his performance, either were or were

14    not egregious or improper.  I didn't read it that way.

15         What -- how I read it was that even if these

16    things took place, if you don't give the guy notice and a

17    chance to cure, it's improper to terminate it.

18         And so, again, I think you're talking about four

19    or five issues that Mr. Goldberg identified that are not

20    complicated and, again, I don't see it as being very much in

21    dispute.  I mean, there were issues of whether he attended

22    meetings after COVID hit and there's no dispute that Mr. Luck

23    didn't attend certain meetings.  That's not complicated.  It

24    doesn't involve --

25         THE COURT:  I don't know why he didn't attend

1  them.

2  MR. STEINBERG:  Okay.  But that wasn't -- in that

3  80-page ruling, you won't see any discussion about why or

4  what -- why Mr. Luck didn't attend those meetings or not.  I

5  don't think you'll see any evidence adduced on that issue.

6  So, that judge knows about that much about that issue as you

7  do, from the way that I look at things.

8  And so, again, I think that you're absolutely

9  right that this judge was involved with the -- this district

10 court judge who doesn't do bankruptcy, I'm sure, on a day-to-

11 day basis, was involved with respect to aspects of this

12 contract, where there were questions about Mr. Luck's

13 performance, but I think that's as far as it goes.  And I

14 don't think those four or five facts that we're talking about

15 are so important that you should overlook what I view are the

16 central issues, the central insolvency and bankruptcy issues

17 that are raised in this litigation.

18 And those central issues pertain to insolvency and

19 reasonably equivalent value, and the 547(b) factors.  And if

20 you put them on a scale side-by-side and say, What's the

21 relevant -- the relative import, with respect to those things

22 and what's going to have to actually be determined in this

23 litigation, I think the balance weighs far heavier in favor

24 of the bankruptcy issues that were not adjudicated or not

25 even addressed in that litigation versus the few factual

1    issues that were.

2         THE COURT:  But your argument here is on you want

3    a bankruptcy judge and not a district judge.  I don't think

4    there's any cases that talk about that.  And, certainly, a

5    district court judge is more than capable of deciding these

6    issues and a district court judge -- in fact, that's where

7    the jurisdiction lies in the district court.  That's where

8    bankruptcy jurisdiction lies.

9         So, I don't think there's any case that turns on

10   that issue, whether it's a bankruptcy judge or a district

11   judge that decides it.

12        MR. STEINBERG:  I'd agree with that and that's not

13   the point that I'm trying to make.

14        The point I'm trying to make is that the

15   bankruptcy and district court judges in Delaware, in terms of

16   their experience in dealing with avoiding action claims, have

17   extensive experience in terms of doing so, which is why this

18   is our preferred forum and why we chose to file this action

19   here.  It's because of the expertise of the judiciary in

20   connection with this matter and, again, no sleight is

21   intended of the Connecticut District Court judge.  I don't

22   have any question that he's a very capable jurist, but to the

23   extent you are talking about familiarity, I don't think that

24   familiarity should stop at just these few factual questions.

25        I think familiarity should also be viewed with

1  respect to the legal issues that are being called upon to be

2  decided here.  And so, when you look at it from the

3  perspective of familiarity of the legal issues, I think that

4  weighs in favor of this Court, the Delaware Court, district

5  court and bankruptcy court, retaining this case.

6          Let me move on to the other factors, the one of

7  relative administrative difficulty, due to congestion.  The

8  case law that we cited said absent a showing by the

9  movement -- the Movant, concerning congestion, the factor

10 favors denial.  They didn't present any evidence of

11 congestion in Connecticut or here, zero, and their failure to

12 do so results in this factor weighing in our favor.

13         And, again, question don't know what the situation

14 is going to be in Connecticut, but we do know that until this

15 case is -- this adversary proceeding is resolved, we're not

16 going to be able to close the case, and so --

17         THE COURT:  So, why wasn't this brought sooner?

18 Why'd you wait until, what, two years, to bring this case if

19 this is what's going to -- if that is what's holding up

20 closing the case?

21         MR. STEINBERG:  There were extensive settlement

22 discussions.  I will say to you we -- we've settled -- there

23 was another adversary proceeding reference -- potential

24 adversary proceeding reference (indiscernible) and we were

25 able to settle that without the need to have the expense.

1  And we were hopeful that the same could happen here.

2          And there were ongoing things going on in the

3  Connecticut litigation that impacted our ability to sort of

4  get attention and focus for some of the parties in that case

5  who we believe have exposure here.  And so, the resolution of

6  that case, in our view, opened the door for opportunities to

7  get this matter resolved.

8          And, you know, it had been our understanding that

9  that case was going to settle sooner than it did.  But, you

10  know, it was always our hope that we wouldn't even have to

11  file this adversary proceeding.  And, again, we filed it when

12  we did because we wanted to make sure that no statute passed,

13  but it was not because we were twiddling our thumbs or not in

14  communication.  And we did 2,000 -- we did --

15          THE COURT:  Well, you broke up the causes of

16  action.

17          MR. STEINBERG:  Pardon me?

18          THE COURT:  You broke up the estate's claims

19  against Mr. McMahon, at least, right.  You broke up the

20  claims, so --

21          MR. STEINBERG:  We did a cost-benefit analysis in

22  connection with what was in the best interests of the estate.

23  If we felt those claims were very strong and worth pursuing,

24  you know, such as these claims that we're bringing here, we

25  would have brought them here.  And so, you know, we made a

1  determination based upon what we saw.

2           But we did discovery and other things before this

3  lawsuit was filed, so, you know, I just want to underscore

4  that this is not something where we just sat on our hands and

5  filed the adversary proceeding, you know, just before the

6  deadline.

7           So, turning back to that point, which is

8  difficulty due to congestion, that factor weighs in favor of

9  what we are -- our position.

10          The next one is public policy of the fora.  Luck

11 doesn't dispute that Alpha is a Delaware LLC.  Public policy

12 favors resolving disputes involving a Delaware entity in

13 Delaware, so that factor should favor us.

14          Familiar --

15          THE COURT:  Well, doesn't Connecticut -- isn't

16 this neutral?  Doesn't Connecticut policy favor resolving

17 issues for Connecticut businesses in Connecticut and conduct

18 that happened in Connecticut, in Connecticut?  Isn't this

19 more of a neutral factor?

20          MR. STEINBERG:  I'm not going to quarrel with you

21 if you say it's neutral, but I do think that the case law

22 says that it's -- that you look to where the entity is

23 formed.

24          THE COURT:  Let me see.  I don't think it all says

25 that.  Some of it probably does, but I think one of the ones

1  I read -- there's Judge Walrath's decision.

2      (Pause)

3          THE COURT:  Yeah.  In RCS, the Court, looking at

4  public policies of the fora recognizes the centrality public

5  policy and how transferring the venue of an avoidance action

6  creates a slippery slope.  But here, she says:

7          Here, like other Chapter 11 cases, the Plaintiff

8  is pursuing multiple avoidance actions.  Transfer would be a

9  burden, therefore, public policy strongly keeps the --

10  supports keeping the adversary proceeding in Delaware.

11          So, she's weighing the issue and she's saying,

12  Yeah, this is, like in Hechinger, RCS has all -- has

13  hundreds, if not thousands -- she's quoting Hechinger.

14          But we don't have that here.  We have one

15  adversary proceeding, so how does that fit into the public

16  policy factors that, for example, Judge Walrath considered in

17  RCS?

18          MR. STEINBERG:  I don't have that case right in

19  front of me as you're speaking.  But in terms of the public

20  policy of the forum, I thought that to be a different issue

21  than the one we're saying you don't want a potentially

22  inconsistent determinations on avoiding action claims, which

23  could fall into the practical considerations test, as opposed

24  to the public policy fora.

25          THE COURT:  I don't know.  That's what Judge

1  Sontchi does in <u>Visteon</u>.  He has the same thing, public
2  policy.  Transferring this adversary proceeding to Michigan
3  would harm the public policy of centralizing bankruptcy
4  matters in maximizing the recovery of creditors.  It would
5  set a troubling precedent for other preference actions,
6  opening the door to transfer them away from the forum of
7  <u>Visteon</u>'s Chapter 11 case.  But, again, I don't have that
8  here.  That seems to be what the courts are considering, in
9  terms of public policy, at least those two.  And they all
10 make a point of saying -- they both, those two make a point
11 of saying they have a lot of preference actions.
12         MR. STEINBERG:  Right.  I think that's an additive
13 factor on the public policy.  I still think that the public
14 policy argument that disputes involving a Delaware entity
15 should be resolved in Delaware still stands because Alpha is
16 a Delaware entity.
17         THE COURT:  Okay.  But I think Connecticut has an
18 equally strong public policy to say that companies that are
19 doing business in its state, they have an interest in
20 resolving those controversies, even if they are incorporated
21 elsewhere.  Why doesn't Connecticut have an equally strong
22 public policy?
23         MR. STEINBERG:  All right.  So, then, if you want
24 to say it's neutral, then it's neutral.
25         THE COURT:  I'm just questioning your authority

1 here, because I'm not seeing the same -- that's why I say, I

2 think this is an individual situation. I'm not sure there's

3 a law that decides this matter.

4            Okay. Let's go to our next one.

5            MR. STEINBERG: Okay. Familiarity of the judge

6 with applicable state law. The preference claims, obviously,

7 are certainly not state law claims.

8            THE COURT: Uh-huh.

9            MR. STEINBERG: The 548 claim is not a state law

10 claim.

11            THE COURT: Well, one of them is.

12            MR. STEINBERG: They're actually not --

13            THE COURT: Oh, not 548, the 544 claim is.

14            MR. STEINBERG: The 544(b), they cited in a reply

15 brief that they make the argument, but I would call the

16 Court's attention to In re EPD investment Co. LLC, 523 B.R.

17 680, 685. It's a bankruptcy appellate panel decision that

18 the Ninth Circuit decided in 2015 where that Court said

19 that 544(b) is a right created under the Bankruptcy Code to

20 bring a state law or other law avoiding claims. It's not an

21 action to assert a state law creative right. That's what

22 that case says.

23            And so, you look to state law, but it is not a

24 state law creative right. 544(b) is a federal claim and

25 that's what EDP [sic] --

1          THE COURT:  I don't think I agree with that.  The

2    five -- no, I don't think I'd agree with that.

3          No, it creates the ability of a trustee to bring

4    the claim, but it is a state law claim.  Without 544, the

5    bankruptcy trustee couldn't bring it.

6          MR. STEINBERG:  Correct.

7          THE COURT:  That's a different issue.  It permits

8    them to bring it, but it's a state law.  Fraudulent

9    conveyance is a quintessential state law claim.  It exists

10   independently of the Bankruptcy Code, absolutely.

11         MR. STEINBERG:  Certainly, state law avoiding

12   actions, I don't quarrel with you, but because of the fact

13   that the statute, then, enables the trustee to bring a

14   fraudulent transfer claim under 544, is 544(b), which is a

15   federal claim --

16         THE COURT:  So, whose law do I apply?  So, when

17   I'm looking at that state law claim -- no.  You're -- when

18   I'm looking at this federal claim, you say, under 544, what

19   law do I apply?  Where's the federal common law that applies

20   that?

21         MR. STEINBERG:  I think under this you would apply

22   the state law avoiding action in Connecticut.  So, I agree

23   that you would look to Connecticut law, but it's --

24         THE COURT:  Wouldn't that govern it?

25         MR. STEINBERG:  Yes.

1           THE COURT:  So, how is this helping you?

2           MR. STEINBERG:  Because the issue is the

3  applicability of state law.  And, again, I fall back on the

4  language in the EDP case -- the EPD case that says it's a

5  federal law claim.

6           THE COURT:  What bankruptcy judges were on that

7  panel?

8           MR. STEINBERG:  I can't answer that question, as I

9  sit here.

10          THE COURT:  Yeah, I disagree with them.  Based on

11  the way you're characterize it, I disagree with them.  I

12  think this is no different than in Cybergenics that talks

13  about fraudulent conveyance claims, a Third Circuit case that

14  talks about it, and it distinguishes.  It's the ability to

15  bring it.  The cause of action itself isn't an estate claim;

16  it's the ability to bring a cause of action that the trustee

17  has.

18          So, based on what you're saying, I disagree.

19          MR. STEINBERG:  All right.

20          THE COURT:  But in any event, what I think I have

21  to look to, or any judge doing this has to look to, is

22  Connecticut fraudulent conveyance act, which may not be that

23  different from Delaware, because it's uniform, but

24  nonetheless, I would look to Connecticut state law.

25          MR. STEINBERG:  That -- you just made the point I

1   was going to make, that it's under the Uniform Voidable

2   Transfer Act, I didn't see a difference between the Delaware

3   and the Connecticut statutes; otherwise, I would have raised

4   it and said, Ah ha, here's the distinction between the two

5   and here's why we're prejudiced or not prejudiced, but --

6                THE COURT:  Well, the complaint brought it under

7   Delaware law.

8                MR. STEINBERG:  Uh-huh.

9                THE COURT:  But I think it's probably Connecticut

10  law.  I don't know.  I haven't had it briefed to me.

11               MR. STEINBERG:  All right.  The last factor is the

12  local interests in deciding local controversies at home.  And

13  courts have said disputes involving amounts owed to the

14  bankruptcy estate should be decided by the home court.  And

15  so, in our view, this favors denial of the motion.

16               THE COURT:  Okay.

17               MR. STEINBERG:  So, in terms of tallying up here,

18  well, when I opened the argument, I said 10 or 11.  I think

19  you've certainly given me pushback on several of those, but I

20  still think that if you were just looking at numbers, you

21  would say that the majority of the factors still favor the

22  Court's retention of it.

23               There is the Plaintiff's choice of forum, which is

24  the most important factor, which shouldn't be overlooked.

25  And there's the holdings that say that there's a strong

1  presumption in favor of maintaining venue, and I don't

2  believe Mr. Luck has presented evidence to rebut that

3  presumption.

4          Again, at bottom, Your Honor, I concede to you

5  that, you know, some of those facts certainly were in front

6  of the Connecticut judge, but I think in terms of the legal

7  issues and the most important facts that are central to the

8  adjudication of these disputes, they were not.  And so, all I

9  would say is, it's a forest through the trees.  I acknowledge

10 that they've got certain facts that we may reference to -- I

11 can see that -- but it's the important facts that you would

12 have to look to and the legal issues that need to be decided

13 that were not in front of that Judge.

14         And so, I think that given that, that it would be

15 appropriate for this Court to deny the transfer of the venue,

16 allow us to proceed, allow this Court to ensure that the case

17 gets administered in a timely fashion so that we can wrap up

18 this litigation and wrap up the bankruptcy estate.  And, you

19 know, maybe we will get the Connecticut Judge Bolton who

20 presided over the case, maybe we won't.  We don't know that

21 as we're standing here and we don't know what the timeline is

22 or how long it will take for things to get adjudicated if you

23 transfer venue.

24         THE COURT:  Well, we don't know here either,

25 because as you say, it's going to be in front of the district

1    court, because, among other reasons, a Plaintiff requested a

2    jury trial.  So, the Plaintiff, why didn't he just file it in

3    the district court?  You demanded a jury trial, so why even

4    file it here?  Why's it in front of me?

5              MR. STEINBERG:  You know, from our perspective, we

6    just felt it was best to file it here and go through the

7    withdrawal process.

8              THE COURT:  Okay.

9              MR. STEINBERG:  Thank you, Your Honor.

10             I thank you for indulging me --

11             THE COURT:  Oh, certainly.

12             MR. STEINBERG:  -- and you've been very patient in

13   terms of allowing me to go through that presentation.

14             THE COURT:  It's been interesting.  No, that's

15   exactly what you should have done.  That's what argument's

16   for.

17             MR. GOLDSTEIN:  Your Honor, I just have a few

18   cleanup items here.  There are lots of facts in dispute.

19   You're not going to be too surprised by that.

20             The complaint paragraphs 15 through 23 make wide-

21   ranging allegations about lack of performance of doing his

22   job, which start with phrases like "among other things,"

23   which makes me think to defend the case, you have to put on

24   evidence of doing your job, which is wide-ranging.

25             With regard to evidence of, that, you know, where

1  the claim arose, in the declaration we were discussing, Mr.

2  Luck does say, when I don't think it's controversial, that he

3  moved into a hotel in 2018 and then he got a town -- he

4  bought a townhouse in Greenwich, Connecticut, during his time

5  when he worked at Alpha.

6        The books -- I'll skip that.  With regard to cost

7  for Mr. Luck, Your Honor knows every time -- I've been

8  practicing for 16 years -- a lot of time, I've had to come

9  down here and see my friends at Bayard.  They have to come to

10  court with me when I come to court here.  They're -- they

11  look and they're great lawyers and they look at everything we

12  file and review it and made good comments.  That's a cost

13  every time we do something.  So, I think Your Honor can take

14  notice of those -- that those costs are just part of

15  litigating any case in Delaware with local counsel.

16        THE COURT:  They are, but I'm not sure they're a

17  reason to transfer.

18        MR. GOLDSTEIN:  The --

19        THE COURT:  Let me ask this general question.

20  Mr. Steinberg, on multiple -- for multiple of these factors

21  said Mr. Luck has presented no evidence; no evidence of this,

22  that, or the other.  What do I do with that, because we did

23  not have an evidentiary hearing?

24        MR. GOLDSTEIN:  Well, I don't know if any facts

25  are in dispute.  So, a lot of things that we are relying on

1  are of record and I was going to point out to a few of those.

2         THE COURT:  Okay.

3         MR. GOLDSTEIN:  So, for example, Document 195 is

4  the statement of financial affairs.  I didn't print out the

5  whole of it, because it's enormous, but page 285 to 287 lists

6  who are the officers of the company in the statement of

7  financial affairs, which are Basil DeVito and Jeffrey

8  Pollock, both of whom are listed with an address in

9  Connecticut.

10        If we look at the complaint at paragraph 22, it

11 talks about that Luck's business shortcomings necessitated

12 the hiring of Jeffrey Pollock, so that's somebody we're going

13 to want to have testify at the case.  And I should say, in

14 the statement of financial affairs, we have -- Basil DeVito

15 was identified as the executive director of operations.  Mr.

16 Pollock is identified as the president and chief operating

17 officer.  These are people with high-level executive

18 positions who are going to want to have their testimony in

19 this case.

20        Docket ID 8 is the first day declaration of Mr.

21 Pollock.  He talks in paragraph 19, on page 8 of 13, of the

22 shared-services arrangement with WWE, which provides WWE --

23 quote:

24        WWE provides the debtor with certain centralized

25 corporate and administrative services; principally, finance

1  and accounting services.

2         Footnote 7, the shared-services agreement also

3  covers additional services, such as HR and marketing, that

4  were initially provided by WWE before being transitioned to

5  the debtor.

6         So, a lot of this is of record and these are the

7  people that we are going to want to talk to.  When it comes

8  to the negotiation, the arrangement for his compensation, did

9  they talk to other potential candidates?  What were they

10  demanding for salary?

11         And then going into things about the performance

12  of his job, in that supplemental declaration that Mr. Luck

13  gave, you know, he does talk about having to work with,

14  during his time there, the co-CEOs of WWE, the general

15  counsel of WWE, and the senior vice president of human

16  resources, and he names them all.  These are the senior

17  executives that we're going to want to have their testimony

18  here.

19         So, look, I don't think there are facts really in

20  dispute on this.  And, you know, we've mentioned some in our

21  briefing, and a lot of this is of record that we're relying

22  on.

23         With regard to the inability to get somebody to

24  testify at trial, the test is, as I understand it from

25  reading the Mitel v Facebook, which was a district court case

1  of Delaware, which we cited -- it's 943 F.Supp. 2nd 436 --

2  that we can't show that (indiscernible) some certainty that

3  these people wouldn't show up.  It's just a reason to believe

4  that they won't testify without a subpoena.  I think

5  terminating Mr. Luck gives us some, you know, some reason to

6  suspect that the former or other former executives aren't

7  going to necessarily cooperate with them.

8          Let me see.  The other items I just want to

9  address quickly, the whole argument about, well, the district

10 court didn't decide these issues.  If the district court

11 didn't decide these issues, I mean, if the district court did

12 decide this, we would have filed a motion to dismiss, not a

13 motion to transfer venue.

14          I think the essence of it is, one, familiarity,

15 and two, there is some impact on, you know, having a judge

16 who's familiar with it.  If the issue was as simple as, Well,

17 you didn't give notice and an opportunity to cure, maybe that

18 plays a little bit into a reasonably equivalent value

19 analysis, but the point was familiarity with those underlying

20 issues.

21          But with regard to being a Delaware-formed entity,

22 I mean, there are cases that transfer litigation where the

23 Plaintiff is a Delaware-formed entity where they really don't

24 have much happening in Delaware, but that.  Mitel Networks is

25 one of them.  And then there was a case, DHP Holdings II

1 | Corp. which was a Bankruptcy Court case, that wasn't an

2 | avoidance action; it was like an AR collection case --

3 | THE COURT: Uh-huh.

4 | MR. GOLDSTEIN: -- where that one was sent to --

5 | it was an AR collection case against Home Depot and the

6 | judge -- I think it was Judge Walrath -- I'm doing this from

7 | memory -- sent it to the Northern District of Georgia. And

8 | part of it was, like, this isn't so central to what's

9 | happening in the bankruptcy case -- it's a collection

10 | proceeding -- so we'll send it there. So, you know, that

11 | doesn't answer the question in its entirety.

12 | So, that's -- I have nothing further, Your Honor,

13 | if you have any questions for me.

14 | THE COURT: What about the idea that while there

15 | aren't a hundred preference actions, this is the last thing

16 | that has to be wrapped up before this case can be closed?

17 | MR. GOLDSTEIN: I think the issue in the case law

18 | that I read was the focus was on the -- you want to

19 | centralize where there are a numerosity of proceedings that

20 | are like the same kind of thing. It wasn't necessarily -- I

21 | didn't see anything in the case law saying, Well, there's

22 | just this one thing remaining and that's going to decide it.

23 | I think one way or the other, the case will get

24 | litigated and move forward. I think we have the advantage

25 | of -- if we get to Connecticut and before Judge Bolton, we

1  have a judge who's very familiar with everything and will be

2  able to move the case with some speed.

3          But I don't see -- I didn't see anything in the

4  case law suggesting one way or the other that particular

5  issue.

6          THE COURT:  No, I think this case has some unique

7  procedural postures in front of me in multiple ways that I

8  don't see in, you know, the typical preference action case.

9          Okay.  Thank you.

10          MR. GOLDSTEIN:  Thank you, Your Honor.

11          THE COURT:  Okay.  Is that really right?  Oh, it

12  is right.  Wow.

13          I want to collect my thoughts on this.  As I said,

14  I think it's really an unusual fact pattern, so I'm going to

15  do that.  I will say that my colleague's comment on

16  multifactor tests that get beyond three factors is probably

17  pretty -- it's almost a truism when you have that many

18  factors.  So, I really don't find 12-factor tests very

19  helpful.

20          I think it is clear that this is within the sound

21  discretion of the Court.  I want to make sure my discretion

22  is being -- that I'm acting soundly in my discretion here.

23  So, I'm going to collect my thoughts and what I'm going to do

24  is I will issue a bench ruling, but I will do it later this

25  week and I will let all of you all participate by Zoom if

1  that's what you would like to do.  You can also be here in

2  person if you want to be, but I will get it done this week

3  and I will collect my thoughts.

4          There are some unique aspects of this case,

5  including, in my mind, the fact that the estate chose to

6  pursue certain of its claims against Mr. Luck elsewhere and

7  so that a judge did gain some familiarity with the underlying

8  factual situation.  But I will back to you.  Ms. Johnson will

9  be back to you with a time.

10          Thank you very much.  I really did appreciate the

11  argument.  And those who get the brunt of it, it's helpful

12  for me to have your answers, so I appreciate it.

13          COUNSEL:  Thank you, Your Honor.

14          THE COURT:  Thank you.

15      (Proceedings concluded at 3:28 p.m.)

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter to the best of my knowledge and ability.


/s/ William J. Garling                    February 8, 2023

William J. Garling, CET-543

Certified Court Transcriptionist

For Reliable